UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MICHAEL GOLDSTEIN, GOLDSTEIN          :
GROUP HOLDINGS, INC., BERNARD         :
KAHN, DAVID WEINBERG, and RAPHAEL     :
KNEPLER,                              :
               Plaintiffs,          :     **MEMORANDUM DECISION**
                                      :
v.                                    :     11 CV 6227 (VB)
                                      :
SOLUCORP INDUSTRIES, LTD., EAST       :
MORGAN HOLDINGS, INC., LONDON         :
VENTURES CAPITAL CORP., MICHAEL       :
REIDEL, RICHARD RUNCO, RICHARD        :
GREENE, ISRAEL TRYBERG, PETER         :
MANTIA, and JOSEPH KEMPROWSKI,        :
               Defendants.          :
------------------------------------------------------------x

<u>Briccetti, J.</u>:

       Plaintiffs commenced this action asserting claims for securities fraud under Section 10(b)

of the Securities Exchange Act of 1934 and supplemental state law claims.  Before the Court are

defendants' motion to dismiss the amended complaint (Doc. #41) and plaintiffs' motion for an

extension of time to substitute a proper party for defendant Richard Runco, who is deceased

(Doc. #54).  For the following reasons, defendants' motion is DENIED and plaintiffs' motion is

GRANTED.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as to the federal

law claims and 28 U.S.C. § 1367 as to the state law claims.

## BACKGROUND

       For purposes of deciding the motion to dismiss, the Court accepts all factual allegations

in the amended complaint as true and draws all reasonable inferences in favor of plaintiffs.

This action arises out of allegedly misleading statements purportedly made by defendants regarding the risks and benefits associated with investing in defendants East Morgan Holdings, Inc. ("EMHI") and Solucorp Industries, Ltd. ("Solucorp").  According to plaintiffs, these misleading statements induced plaintiffs to invest in EMHI and/or Solucorp.

Solucorp owns the rights to certain patents and intellectual property used to remediate contaminants.  Since its inception, however, Solucorp and its individual officers have repeatedly run afoul of various regulatory agencies.  In 1994, defendant Joseph Kemprowski, who then served as an officer and director of Solucorp, was requested to resign from those positions by the Vancouver Stock Exchange ("VSE") – the exchange upon which Solucorp stock was then traded – after the VSE learned Kemprowski had previously pleaded guilty to criminal charges relating to consumer fraud.  Kemprowski resigned from Solucorp, but remained president, CEO, and chairman of EPS Environmental, a company that acted as Solucorp's "chief operating subsidiary."

In December 1994, the Securities and Exchange Commission ("SEC") sanctioned Kemprowski for disseminating false and misleading information to investors, and ordered him to cease and desist from committing further violations of the federal securities laws.

In 1995, the VSE ordered Solucorp to sever all ties to Kemprowski, which Solucorp claimed it did.  However, Kemprowski remained a paid consultant to Solucorp, and subsequently was given the largest office at Solucorp's headquarters in West Nyack, New York.  According to the SEC, Kemprowski continued to act as a de facto officer of Solucorp.

In August 1996, Solucorp delisted its securities from the VSE after an eight-month trading suspension.  Solucorp's securities were subsequently traded on the National Association of Securities Dealers' Over-the-Counter Bulletin Board.

2

In 1998, the SEC suspended trading of Solucorp stock, and in December 1999, the SEC filed a civil injunctive action in this District against Solucorp, Kemprowski, defendant Peter Mantia, and several other Solucorp officers and employees.  In that action, the SEC alleged that Kemprowski, Mantia, and others had engaged in a scheme to defraud investors over a four-year period by, inter alia, issuing press releases grossly overstating Solucorp's expected revenue from its contracts with other companies.

In a decision dated September 26, 2003, issued after a bench trial, the court found in favor of the SEC.  The court concluded:

> Over a number of years, Solucorp and its executives engaged in a course of deception through the issuance of false and misleading press releases and financial statements in which, in a number of cases, they reported that the Company had entered into contracts that did not exist, in one case backdated a contract to increase the accrued revenue recognizable thereunder, and in many other cases reported that the minimum revenues to be derived from such contracts far exceeded the actual minimums.  This pattern of deception was so consistent and pervasive that it cannot logically be attributed to mere negligence.  The Court therefore finds that the executives responsible for the issuance of these press releases and financial statements, specifically Kemprowski [and] Mantia . . . , knowingly and deliberately falsified them with the intention of deceiving shareholders and potential investors or, at the very least, were guilty of reckless disregard for the truth or falsity of the disclosures.

S.E.C. v. Solucorp Indus., Ltd., 274 F. Supp. 2d 379, 418 (S.D.N.Y. 2003).  The court further found that Kemprowski and Mantia were "substantially unfit to be officers or directors of a public company," and permanently barred them from serving as such.

According to plaintiffs, despite the adverse court decision and the various admonitions and penalties levied by the VSE and SEC, "Kemprowski and Mantia have continued to serve as de facto officers of Solucorp, and consultants to [Solucorp] and its subsidiaries."

In 2009, in light of Solucorp's sullied reputation as a result of the SEC action, Kemprowski and "entities under his control," including defendant London Ventures Capital

Corp. ("London Ventures"), acquired EMHI to serve as a "shell corporation" for Solucorp. EMHI then began to promote the sale of its stock by representing it held valuable patents and technologies previously owned by Solucorp.

Goldstein's Stock Purchases

In May 2010, plaintiff Michael Goldstein was introduced to defendant Michael Reidel by defendant Israel Tyberg.  Reidel told Goldstein that EMHI now owned Solucorp's valuable intellectual property, and within days EMHI would announce a deal it had made with First Solar, Inc., that would generate $30 million in annual revenue for EMHI.  Reidel also told Goldstein that an unnamed "market maker" was going to buy $2 million worth of EMHI stock at $7 per share.  At the time, EMHI stock was trading at approximately $0.40 per share.  Reidel encouraged Goldstein to invest in the company, gave Goldstein Kemprowski's phone number, and said Kemprowski "was in charge of the company."

Goldstein then called Kemprowski, who confirmed that EMHI had a deal in place with "a major solar manufacturer," and the two arranged to meet three days later.  That meeting, which was also attended by Reidel, was held at Solucorp's headquarters in West Nyack.  Signs in the building indicated it also housed the offices of London Ventures.

At the meeting, Kemprowski told Goldstein he was transferring valuable patents from Solucorp to EMHI, and that EMHI had a contract in place with First Solar that would generate $30 million per year.  Reidel then offered to sell Goldstein EMHI stock for $0.40 per share, assuring Goldstein it would be worth $7 per share in a few days because of the deal in place with the "market maker," which Reidel disclosed was Goldman Sachs.

Shortly after Goldstein met with Kemprowski and Reidel, Tyberg told Goldstein he knew "for a fact" that EMHI had a deal with Goldman Sachs to buy up EMHI's shares, and Goldstein had "better act quickly or he would lo[s]e the opportunity."

On June 4, 2010, Goldstein again met with Kemprowski and Reidel at Solucorp's headquarters. Mantia was also present at that meeting. Kemprowski, Reidel, and Mantia confirmed that EMHI had a valuable contract with First Solar and Goldman Sachs had agreed to buy EMHI stock for $7 per share. Reidel told Goldstein he had seen the written agreement between EMHI and Goldman Sachs, but he could not show it to Goldstein because doing so would cause Goldstein to become an "insider," and Goldstein would thus lose his ability to quickly sell his EMHI shares after the stock increased in value.

In the ensuing week, Goldstein spoke with Kemprowski, Reidel, and Mantia several times on the telephone. In addition to urging Goldstein and his company, plaintiff Goldstein Group Holdings, Inc. ("GGH"), to buy EMHI stock, defendants also told Goldstein they were in the process of "registering" the stock so trading of EMHI shares would no longer be "restricted."

At the suggestion of Kemprowski and Mantia, Goldstein then called defendant Richard Runco. Runco told Goldstein he was the former CEO of Solucorp and current CEO of EMHI, and confirmed that EMHI held Solucorp's patents and had a lucrative contract with First Solar.

Goldstein once more met with Mantia at Solucorp's headquarters, and Mantia showed Goldstein a document printed on First Solar's letterhead, which Mantia said was the $30 million contract. However, Mantia did not permit Goldstein to read the document.

The following week, Goldstein contacted defendant Richard Greene, whom Kemprowksi had told Goldstein was the attorney "handling the EMHI deal." Greene told Goldstein he would handle Goldstein's purchase of EMHI shares, and confirmed the details of the First Solar

5

contract and the deal with Goldman Sachs.  Greene said an EMHI board "would be put in place

soon and the shell would be given life."  Greene also told Goldstein the stock would be

registered within thirty days.  In addition, Greene said he would put the money Goldstein was

investing into an escrow account he controlled.

Greene failed to tell Goldstein that he (Greene) had previously been convicted of federal

securities fraud charges and consequently had been disbarred in Florida.  Plaintiffs contend

neither Goldstein nor GGH would have invested in EMHI or let Greene hold their money in

escrow had they known Greene had pleaded guilty to securities fraud and been disbarred.

On June 17, 2010, Goldstein signed an agreement to purchase EMHI shares at Solucorp's

headquarters.  Kemprowski, Mantia, and Reidel were personally present and Greene and Tyberg

were present via telephone.  Goldstein and GGH paid more than $1 million for the shares, which

were purchased from "Richard Greene Legal Support, Inc."  Two days later, defendants asked

Goldstein to re-execute the agreement, which this time indicated Richard Green Legal Support,

Inc. was acting as an escrow agent for seller "Jon B. Wallis."  Goldstein had never met or spoken

to "Wallis."

On June 21, 2010, Goldstein purchased additional shares of EMHI stock from London

Ventures, Reidel, and an individual named Moses Wolf, whom Goldstein had never met.

Kemprowski assured Goldstein the restricted stock he purchased would be registered within

thirty days, but the stock was never registered.

Sometime after purchasing the EMHI stock, Goldstein learned (1) Goldman Sachs had

never agreed to purchase EMHI stock at $7 per share, and (2) at the time defendants represented

EMHI had a $30 million contract with First Solar, EMHI was already in breach of that contract,

which, in any event, was worth substantially less than defendants had represented.  As discussed

above, Goldstein alleges he relied on the veracity of defendants' statements regarding First Solar and Goldman Sachs in deciding to invest in EMHI.

At the time the amended complaint was filed, EMHI's stock was worth approximately $0.23 per share. Further, there is a "Stop Sign" on EMHI shares on the Over-the-Counter market, making the shares effectively untradeable.

Stock Purchases by Kahn, Weinberg, and Knepler

Defendants also convinced plaintiffs Bernard Kahn, David Weinberg, and Raphael Knepler to invest in EMHI and/or Solucorp in 2009 and 2010. In addition to making statements substantially similar to those made to Goldstein with respect to the First Solar contract and Goldman Sachs, defendants also said that EMHI and Solucorp had entered into other contracts plaintiffs later learned did not exist. Additionally, defendants told Kahn that Greene was preparing a report regarding Solucorp that would be submitted to the SEC "to clear-up the corporate name." No such report was ever created. Kemprowski also told Kahn that former professional football player Joe Theismann had invested heavily in Solucorp. Plaintiffs later learned that representation was also false.

Weinberg purchased thousands of shares of EMHI stock in May 2009 and Solucorp stock in the summer of 2010, making payments directly to London Ventures.

In August and September 2010, Kahn purchased several thousand dollars worth of Solucorp stock, $25,000 of which was wired directly to London Ventures.

Sometime after May 2009, Knepler purchased $400,000 worth of EMHI stock.

Each of the individual defendants is alleged to have benefited from plaintiffs' stock purchases by receiving a commission or by subsequently selling stock for a greater profit because of plaintiffs' investments. Solucorp benefited because some of plaintiffs' money was

7

used to pay off Solucorp's debts.  London Ventures and EMHI benefited by receiving cash and/or experiencing a temporary increase in the value of their stock.

Plaintiffs commenced this action on September 6, 2011, asserting claims against defendants for violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") as well as state law claims for common law fraud, promissory estoppel, and unjust enrichment.

## DISCUSSION

"The function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984) (internal quotation marks omitted).  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.

I.    Violations of the Securities Exchange Act of 1934

Counts One and Two of the amended complaint allege defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5.  Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

Claims for securities fraud are subject to the heightened pleading standard of Rule 9(b).  Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000).  To state a claim for a violation of Section 10(b) and Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff[s'] reliance was the proximate cause of [their] injury."  ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

Pursuant to Rule 9(b), when claims are based on a misrepresentation, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).  Furthermore, plaintiffs' allegations must provide facts "that give rise to a strong inference of fraudulent intent."  Lerner

9

v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

To state a claim, plaintiffs must identify misleading statements and "demonstrate with specificity why and how" the statements are misleading.  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  The "why" inquiry–why the statement is misleading–is essential to stating a claim.  Id. at 172; In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233, 239 (S.D.N.Y. 2006); 15 U.S.C. § 78u–4.  The statement must be alleged to have been misleading at the time it was made and not with the benefit of hindsight.  Ganino v. Citizens Utils. Co., 228 F.3d at 165.

Here, plaintiffs have sufficiently pleaded a Rule 10b-5 claim.  With respect to each defendant, plaintiffs have specified the "'who, what, when, where and how' of the alleged misstatements" made by defendants.  In re Ambac Fin. Group, Inc. Sec. Litig., 693 F. Supp. 2d 241, 275 (S.D.N.Y. 2010).  Plaintiffs have specified the dates, times, and places where each defendant made false statements concerning, among other things, EMHI's alleged contract with First Solar and the agreement with Goldman Sachs.  Further, plaintiffs have demonstrated "why" these statements were misleading – they led plaintiffs to believe investing in EMHI and/or Solucorp would be substantially more lucrative than it actually was.  Contrary to defendants' contentions, detailed statements concerning the existence of specific contracts and agreements go well beyond "expressions of puffery and corporate optimism[, which] do not give rise to securities violations."  Rombach v. Chang, 355 F.3d at 174.

10

Defendants also argue plaintiffs' fraud claims should be dismissed because plaintiffs have failed to allege that defendants' knew the statements were false when they were made, citing Gissin v. Endres, 739 F. Supp. 2d 488, 500-01 (S.D.N.Y. 2010).  Defendants' argument is unavailing.  First, plaintiffs have alleged facts indicating several of the defendants have perpetrated strikingly similar fraudulent schemes in the past.  Second, it simply does not stand to reason that defendants would make detailed statements concerning the terms of non-existent contracts and agreements, without knowing at the time those statements were false.  Plaintiffs thus have demonstrated "the requisite 'strong inference' of fraud . . . by alleging facts . . . show[ing] that defendants had both motive and opportunity to commit fraud."  Shields v. Citytrust Bancorp, Inc., 25 F.3d at 1128.

Defendants' motion to dismiss plaintiffs' Rule 10b-5 claims is denied.

II.     State Law Claims

A.      Fraud

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, (1996)).  A party must state with particularity the circumstances constituting fraud or mistake. See Fed. R. Civ. P. 9(b).  "Specifically, the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

11

The elements of fraud under New York law and Rule 10b-5 are essentially the same. Pilarczyk v. Morrison Knudsen Corp., 965 F. Supp. 311, 322 (N.D.N.Y. 1997) aff'd, 162 F.3d 1148 (2d Cir. 1998) (citing Fruchtman v. First Edition Composite Holdings Inc., 1991 WL 238273, at *4 (S.D.N.Y. Nov. 6, 1991)).  Consequently, for the reasons set forth above with respect to plaintiffs' Rule 10b-5 claims, defendants' motion to dismiss plaintiffs' state law fraud claim is denied.

      B.      <u>Unjust Enrichment</u>

To assert a claim for unjust enrichment under New York law, plaintiffs must allege "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff."  Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001).  In short, a claim for unjust enrichment alleges that defendants have received money or a benefit at the expense of plaintiffs.  Paramount Film Distrib. Corp. v. State of New York, 30 N.Y.2d 415, 421 (1972).

Defendants claim plaintiffs have failed to state an unjust enrichment claim because (1) Goldstein "did not pay for a portion of the shares that he allegedly purchased," and (2) "the price per share has almost doubled since the [p]laintiffs[] allegedly purchased their shares."  (Defs.' Br. at 24).  Defendants thus argue they did not benefit at plaintiffs' expense.  However, both of defendants assertions are based on alleged facts contained in documents defendants annexed to their motion papers, not facts alleged in the complaint.  The Court therefore does not consider them on this motion to dismiss, see Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d at 779, and defendant's motion to dismiss plaintiffs' unjust enrichment claim is denied.

C.    Promissory Estoppel

"[T]o state a claim of promissory estoppel under New York law, plaintiff must allege that there was (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance." Travelers Indem. Co. of Conn. v. Losco Group, Inc., 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001).

Here, plaintiffs allege defendants clearly and unambiguously promised, inter alia, that Goldman Sachs had agreed to purchase a substantial amount of EMHI shares at $7 per share and EMHI had a lucrative contract with First Solar.  Plaintiffs allege they relied on those representations, and were subsequently injured as a result of their reliance.  Plaintiffs thus have stated a claim for promissory estoppel, and defendants' motion to dismiss that claim is denied.

III.    Plaintiffs' Motion for an Extension of Time to Substitute a Proper Party

In their motion papers, defendants indicate defendant Runco died in August 2012. Defendants further state: "These papers will serve as notice, pursuant to [Rule] 25(a)(1), of Mr. Runco's death."  (Defs.' Br. at 7).  Plaintiff subsequently moved for an extension of time until June 30, 2013, to serve Runco's successor or representative.  Defendants do not oppose that motion.  In the interest of justice, plaintiffs' motion is granted.  Plaintiffs shall serve the proper substitute party by July 1, 2013.[1]

---

[1]       June 30, 2013, is a Sunday.

**CONCLUSION**

Defendants' motion to dismiss is DENIED and plaintiffs' motion is GRANTED.

The Clerk is instructed to terminate the pending motions.  (Docs. #41, 54).

Dated: March 19, 2013
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge